Filed 9/24/25  In re N.C. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re N.C., et al., Persons Coming Under the Juvenile Court Law. | B342892 |
| _____ | (Los Angeles County Super. Ct. No. 24CCJP03356) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, et al., | |
| Plaintiff and Appellant, | |
| v. | |
| A.N., et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mark A. Davis, Judge.  Reversed and remanded.

Shaylah Padgett-Weibel, under appointment by the Court of Appeal, for Appellant Minors N.C. and K.C.

Dawyn R. Harrison, County Counsel, County Counsel, Kim Nemoy, Assistant County Counsel, and Aileen Wong, Senior Deputy County Counsel, for Plaintiff and Appellant.

Anuradha Khemka, under appointment by the Court of Appeal, for Defendant and Respondent T.C.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Respondent A.N.

_____

A.N. (Mother) and T.C. (Father) are the parents of two sons: two-year-old N.C. and five-day-old K.C. (collectively, Minors).[1]  The Los Angeles County Department of Children and Family Services (the Department) instituted dependency proceedings after Mother and K.C. tested positive for amphetamines at the hospital when K.C. was born.  The juvenile court dismissed the petition because, after its review of a recent appellate decision, it believed it must conclude there was an insufficient nexus between the parents' substance abuse and a risk of serious physical harm to Minors.  Minors and the Department noticed appeals from the dismissal, we issued a writ of supersedeas to stay the juvenile court's dismissal order, and we now consider whether substantial evidence supports the trial court's ruling.

---

[1]     These were Minors' ages at the initiation of dependency proceedings.

2

## I. BACKGROUND

On October 17, 2024, Father received a call from the paternal grandfather who said Mother was suffering severe stomach pain; in the background, Father could hear Mother screaming.[2] Father left work and drove home, and by the time he arrived, Mother had delivered K.C. Father called 911 and an ambulance transported Mother and K.C. to the hospital where staff determined K.C. was born at 35 weeks gestation and weighing four pounds and 14 ounces. While at the hospital, Mother and K.C.'s toxicology tests were positive for amphetamines.

On the day K.C. was born, an emergency response social worker from the Department spoke with hospital staff and Mother. A charge nurse advised Mother said she had no prenatal care because she did not know she was pregnant, she denied any substance abuse, and she explained the positive test as the result of something she may have gotten on her hands at a party prior to giving birth. The charge nurse also related that while there were no signs K.C. suffered from Neonatal Abstinence Syndrome, he did have poor feeding scores due to an undeveloped suck reflex. The charge nurse further advised Mother was unable to stay awake. Because Mother was "out of it" and could not securely hold K.C., he was moved to the nursery for safety reasons. The charge nurse opined Mother's inability to stay awake was typical of a "meth patient." A different nurse on staff

---

[2] At the time, the family was living with the paternal grandparents. When the Department filed its petition, Mother and Father moved out of the home so that Minors could be placed with the paternal grandparents.

3

similarly reported Mother was falling asleep "mid-answer" to questions. Another nurse advised Father also had difficulty staying awake during his short visit with Mother and K.C. and believed he was under the influence of "some drug or something."

Mother, who had difficulty keeping her eyes open during her interview with the Department social worker, initially denied all substance abuse. As the interview progressed, however, she admitted that beginning in March 2024, she began taking a blue pill shaped like an "ace" once a week; Mother stated she paid $50 for each pill and the pills made her feel "up, happy." She described taking the pills at parties held at the home of one of Father's clients, where drugs were "all over the place, cocaine, pills, people smoking everything." Although "everyone" had been asking if she was pregnant for months, Mother thought she was just getting fat and did not suspect she was pregnant until she felt K.C. kicking approximately two weeks before she gave birth. After she felt K.C. moving inside her, Mother elected not to take a pregnancy test or go to a doctor because she felt ashamed about her "partying, with all the pills," "and all the new things we had been trying." Despite knowing she was pregnant, on October 15, 2024, two days before she gave birth, she went to a party and consumed alcohol. That was the party she referenced when claiming someone slipped something in her drink that caused her to test positive for amphetamine.

The following day, the social worker spoke with Father. When asked about Mother's substance abuse, Father stated he "forgot the details." When pressed, he admitted he and Mother "do weed," microdose "THC and [mu]shrooms," and "do these [c]andies" at parties. He clarified that he and Mother only use MDMA/ecstasy "at parties or events," admitted they had "tried"

4

cocaine "sometime in the last year," and stated they occasionally use weed and alcohol when socializing with friends. Despite this history of substance use, Father maintained he and Mother "aren't drug users like that" and repeated, "We do not do drugs. We do not do that, [we] just do it for fun when hanging out with friends." When asked about K.C.'s positive test for amphetamine, Father's response was: "'Lots of kids use drugs!'"

As part of its investigation, the Department also spoke with the paternal grandparents and a paternal aunt. The paternal grandparents denied ever suspecting Mother and Father used drugs or alcohol. The paternal aunt did suspect drug use but never witnessed it.

In October 2024, when K.C. was set to be released from the hospital, the Department sought and obtained a removal order for K.C. Three days later, the Department filed a dependency petition pursuant to Welfare and Institutions Code section 300, subdivision (b)(1).[3] The petition alleged Minors were at substantial risk of suffering serious physical harm or illness as a result of their parents' substance abuse. At the initial hearing, the juvenile court detained Minors from their parents, ordered monitored visitation for Mother and Father, and set an adjudication hearing.

In advance of that hearing, a Department investigator re-interviewed the parents. Mother continued to deny knowing what exactly the blue pills were that she took at the client parties, but she affirmed they made her "happy." In addition, Mother denied any substance abuse history, experimenting with

---

[3]     Undesignated statutory references that follow are to the Welfare and Institutions Code.

5

drugs, and any knowledge of Father using drugs. She acknowledged she should not have gone to the party that was held two days before she gave birth to K.C. and consumed alcohol; she denied, however, taking any drugs at that party. Father maintained he could not account for Mother's positive toxicology screen following K.C.'s birth and stated he and Mother "don't do drugs . . . we're not addicts." When cautioned by the investigator about conflicts with his prior statements to the Department, Father contended the social workers had "mixed up the story" and continued to deny any drug use by either him or Mother: "We are clean, normal[,] good parents. . . . We wouldn't have had a baby if we were using drugs." Father stated he was enrolled in random drug testing and in the process of enrolling in a substance abuse program.

The Department reported the family had no prior child welfare history or criminal convictions and the parents had been cooperative and consistent in their visitation with Minors. The Department also reported that Mother's on-demand drug test on October 22—five days after giving birth—revealed a high level of methamphetamine and amphetamine. (Father's on-demand drug test from that same day was negative.) The Department reported further that Minors appeared physically healthy and were not exhibiting any signs of emotional distress.

In a last minute information report, the Department advised that all of the parents' drug tests in the month of November had been negative.[4] In addition, the Department clarified Father was not yet enrolled in an outpatient drug

---

[4] Father was a "no show" for his only drug test in December 2024.

program due to funding issues.  Although Mother was enrolled in a substance abuse program, she had missed all of her scheduled group sessions and had attended only one individual phone session (and did so only because the counselor took the initiative and contacted Mother).  That counselor related that Mother had not been transparent about her drug history, had not displayed any accountability for or insight into her behavior, and spoke "as if all is perfect."

The juvenile court held an adjudication hearing in December 2024.  After admitting the Department's various reports in evidence, taking judicial notice of the proceeding's file, and hearing argument from counsel, the court dismissed the petition without prejudice.  Relying on *In re B.D.* (2024) 103 Cal.App.5th 315, the court found the evidence was insufficient to establish a "nexus" between Mother and Father's substance abuse and the alleged risk of harm to Minors.  We quote the juvenile court's on-the-record reasoning in full:  "I'll acknowledge to the parties that be that I am always particularly bothered whenever a mother is pregnant and takes drugs.  It is something that I don't know that I typically could get over, and it just seems selfish to me.  [¶]  I read In re B.D., and I see that there's more to it than simply that, and I have to consider the ability to parent and whether there's a nexus and whether the child has shown any adverse consequences, and I have to look at the history, and there's a number of things that the court is obligated to consider, and in doing so, I think that In re B.D. does limit my ability to take jurisdiction on this case in light of the history of this family.  [¶]  There have been no prior calls to—for care about their other children, their other child [i.e., N.C.], I should say.  Although there's positive toxicology here, which for me generally is 'Okay.

7

This is not that difficult of a case to call'—my reading of In re B.D. and the facts that are set forth within that have made me reconsider all of the things that I thought were most important or at least what the law now considers to be most important. [¶] The court is going to dismiss the petition. I'm going to find there's no nexus. I don't do that with any joy because I can tell you I have a big issue with parents that are pregnant and taking drugs, and that whole drug lifestyle is something I'm opposed to, but I don't believe there is a sufficiency for me to sustain the allegations in light of In re B.D., and for those reasons, this matter is dismissed."

## II. DISCUSSION

The juvenile court dismissed the dependency petition not because it disbelieved the Department's evidence but because it believed, with apparent regret, that it was bound by the result in *B.D.*, *supra*, 103 Cal.App.5th 315. The juvenile court, however, overread that opinion, and regardless, we face no such constraint. Looking solely to the evidence in the record and governing law, we hold no substantial evidence supports dismissal of the petition. (*In re J.M.* (2019) 40 Cal.App.5th 913, 922 [reviewing decision to dismiss dependency petition for substantial evidence]; see generally *In re Sheila B.* (1993) 19 Cal.App.4th 187, 198-199.) Mother and Father regularly used drugs before K.C.'s birth— indeed, the record indicates Mother used amphetamine and other substances while pregnant with K.C. and claimed she did not know she was pregnant until two weeks before she was in labor. After K.C.'s somewhat premature birth, Mother frequently fell asleep when she was supposed to be caring for the infant— behavior typical of a "meth patient," according to a nurse—and

8

the child had a poor feeding reflex.  This, and other evidence we will outline, revealed drug abuse presenting a real risk of serious physical harm to infant K.C. and toddler N.C.  Because the juvenile court was not required to wait until that risk materialized into actual harm (see, e.g., *In re Cole L.* (2021) 70 Cal.App.5th 591, 602), it was error not to exercise dependency jurisdiction.

Section 300, subdivision (b)(1), authorizes a juvenile court to exercise dependency jurisdiction over a child if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of [¶] . . .  [¶] (D) The inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's . . . substance abuse." "[U]nder section 300(b)(1)(D), 'substance abuse' bears its ordinary meaning of excessive use of drugs or alcohol . . . ." (*In re N.R.* (2023) 15 Cal.5th 520, 555.)  To "supply grounds for dependency jurisdiction, substance abuse must make the parent or guardian unable to provide regular care for a child and lead to serious physical harm to the child, or a substantial risk of such harm." (*Id*. at 546.)  "Even if a parent's or guardian's excessive use of drugs or alcohol has other negative manifestations, it does not provide a basis for jurisdiction under section 300(b)(1)(D) unless it also has these effects." (*Id*. at 540.)  A court may not apply a presumption in favor of jurisdiction when a child is of "tender years," but "a child's youth and maturity level can bear upon the care that the child may require and whether a parent's . . . substance abuse places the child at substantial risk of serious physical harm.  Courts can properly take these facts regarding a child into account, together with all other relevant

9

evidence, in deciding whether the government has met its burden at the jurisdictional stage." (*Id.* at 559.)

Here, Mother's methamphetamine use rises to the level of substance abuse.[5] The trial court, though it believed it was required to dismiss the dependency petition, concluded Mother used drugs while pregnant with K.C. (as the toxicology test indicated). Another drug test taken five days after K.C.'s birth was positive for methamphetamine and amphetamine at a "high level." Mother admitted to regularly "partying" at locations where drugs were "'all over the place'" and where she regularly ingested pills. Mother explained she was at another of these parties just two days before K.C.'s birth—and knowing she was likely pregnant at that time.[6] In addition, nurses who observed Mother in the hospital after K.C.'s birth opined she exhibited "out of it" behavior consistent with a "meth patient" and a "heavy drug user[ ]."[7] This is effectively expert opinion evidence that strongly

---

[5] Because we so conclude, and because Father was alleged to have failed to protect the children from Mother's substance abuse, we need not discuss whether Father is also properly considered a methamphetamine abuser.

[6] Mother admitted drinking alcohol at this party but claimed someone at the party may have surreptitiously given her methamphetamine by putting "something in [her] drink."

[7] According to one nurse, Mother was "'unable to stay awake. This kind of sleeping is typical of a meth patient, what we will see is extreme sleepiness and then when they wake up, extreme hunger.'" (We understand the nurse's reference to a "meth patient" as a reference to someone abusing methamphetamine because it is unlikely a hypothetical mere user would be a

corroborates the other evidence establishing Mother was not just a methamphetamine user, but a methamphetamine abuser.

Mother's methamphetamine abuse also rendered her unable to provide regular care for Minors and placed them at substantial risk of serious physical harm. This is quite obvious as to K.C. As one of the hospital nurses explained it when interviewed by the Department, "It is not safe to release the baby with her, she is not even able to stay awake, how would she be able to carefully feed the baby? [K.C.] took one hour to eat one ounce, that requires her to be patient and focused. We can do it, but can she do it? I do not believe she can do that yet. She cannot keep her eyes open, and she is nodding off all day. She is in no condition."[8] It is also true, though, with respect to N.C. too. The drug-induced extreme drowsiness and "out of it" condition reported by the nurses (at even a momentous occasion like the birth of a child) poses a comparable and perhaps even greater risk of harm for an unsupervised toddler (able to walk on his own) as it does for an unsupervised infant.[9]

---

"patient" requiring hospital or other medical treatment.) Another nurse explained that Mother "'kept falling asleep mid-answer in [their] conversation, so the baby is going to be in the nursery for now, because it would not be safe for her to hold the baby in the state that she is in."

[8] Another nurse explained K.C. "was going to be in the nursery for now" because it wouldn't be safe for Mother to even "hold the baby in the state that she is in."

[9] This is not an instance where the risk of harm attributable to Mother's inability to care for the very young children might have been mitigated by Father's presence in their life. The

11

*B.D.*, *supra*, 103 Cal.App.5th 315 is not inconsistent with the conclusion we have drawn, i.e., that it was error not to assume jurisdiction over Minors based on the risk of serious physical harm from Mother's substance abuse. The mother in *B.D.* once took pain medication ("norco," or hydrocodone and acetaminophen) that had not been prescribed for her before giving birth to an infant who was found to have the drug in his system when born. (*Id.* at 318-319.) The juvenile court sustained a dependency petition alleging the child was at substantial risk of suffering serious physical harm from the mother's substance abuse. (*Id.* at 323.) The Court of Appeal reversed, holding that even assuming there was evidence that mother abused opiate pain medication, there was no substantial evidence that the abuse caused serious physical harm to her son or put him at substantial risk of suffering the same. (*Id.* at 325, 329-330.) In so holding, the court emphasized "the drugs in [the mother's] system, and that showed up in [her son's] meconium, were prescription drugs, not categorically illegal narcotics." (*Id.* at 326.) The *B.D.* court additionally noted the mother was forthcoming about taking the "norco" pill for back pain before the child's birth (*id.* at 319, 331), there was no evidence that the child "was premature, underweight, or unhealthy in any way" (*id.* at 326), there was "no evidence that mother was impaired when caring for the children" (to the contrary, the mother was attentive to the child at birth, was caring for him appropriately, and

___

record reveals the nurses believed he was also a heavy drug user and high on drugs (repeatedly throwing his "'head back with mouth gaping open, and a head bobbing down from chin to chest'") while present at the hospital for K.C.'s birth.

12

"[n]either the nurse nor the hospital social worker expressed any concerns about [the] mother's ability to care for [the child]") (*id.* at 330), and there was "no evidence that mother had a prior child welfare history related to substance abuse or inadequate care of the children" (*id.* at 330-331).

The differences between *B.D.* and this case are many. Here, the abused substances in question are methamphetamine and other "categorically illegal narcotics," not prescription medication. Here, unlike the mother in *B.D.*, Mother was far from being fully forthcoming about her use of illegal substances. Here, unlike the child in *B.D.*, there was evidence that K.C. was born slightly premature and had a poor feeding reflex. And most important, there was undisputed evidence in this case from multiple nurses that Mother *was* impaired when caring for K.C.—so much so that the hospital staff concluded the child could not be safely left in her care.

We therefore believe the juvenile court was mistaken when believing *B.D.* stood as a bar to asserting dependency jurisdiction in this case. Insofar as some facets of *B.D.* do bear some similarity to the record here (e.g., the absence of prior substance abuse child welfare history or an infant with a positive toxicology screen at birth), we believe those similarities do not warrant following *B.D.* in this case.

## DISPOSITION

The juvenile court's order dismissing the dependency petition is reversed and the matter is remanded to the juvenile court with directions to vacate its order dismissing the petition, to make a new and different order assuming jurisdiction over Minors under section 300, subdivision (b)(1)(D), and to hold a hearing pursuant to section 358 at which it may consider Minors' then-current circumstances when deciding what disposition is appropriate.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


BAKER, Acting P. J.

We concur:



MOOR, J.



KIM (D.), J.


14